**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| TAMRA N. ROBINSON, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | Civ. No. 14-1205-RGA/MPT |
| | : | |
| FIRST STATE COMMUNITY, | : | |
| ACTION AGENCY | : | |
| | : | |
| Defendant, | : | |

**REPORT AND RECOMMENDATION**

## I.    INTRODUCTION

This is an employment discrimination case.  On September 17, 2014, plaintiff

Tamra N. Robinson ("Robinson"), filed suit against defendant, First State Community

Action Agency ("First State"), alleging violations of the Americans With Disabilities Act,

42 U.S.C. § 12101, *et. seq.*  Currently before the court are motions for summary

judgment filed by both Robinson and First State.

## II.    BACKGROUND

Robinson was hired by First State in October 2009 as an Individual Deposit

Account Counselor.[1]  A year later in October 2010, she was transitioned to the position

of Default Counselor.[2]  Robinson was initially supervised by Ponciano Allen,[3] where the

only documented discipline actions were an unsigned "Employee Warning Report" in

---

[1] D.I. 46 at A1.
[2] *Id.* at A5.
[3] D.I.49, Ex. A at 19.

1

July 2011[4] and a 3-day suspension in August 2011.[5]

In September 2011, First State hired Karen Garrett ("Garrett") as the Program Manager of Housing Development,[6] who became the direct supervisor of Robinson.[7] Garrett assumed that Robinson had completed all testing and certifications for her position of Default Counselor, but never reviewed her personnel file to confirm whether Robinson was properly trained.[8]  In December 2011, Garrett became very dissatisfied with Robinson's work, and at one point asked if she knew what she was doing or if she had dyslexia.[9]

Due to Garrett's comment, Robinson sought a psychological evaluation from Phyllis H. Parker, Ph.D., a cousin of Robinson in December 2011.[10]  Dr. Parker, a certified school psychologist for the Trenton Board of Education who has worked in that capacity for the last twenty-six (26) years, serves students in grades K-12.[11]  Dr. Parker administered the following tests:  the Weschsler Adult Scale 4th Edition, Informal Dyslexia Screening, House Tree Person Test, Draw a Person Test, Bender Visual Motor Gestalt Test, as well as conducted an informal interview and observation.[12]  During her deposition, Dr. Parker testified that based on her psychological training and experience that Robinson had indicators of dyslexia.[13]

---

[4] *Id.* at 31.
[5] *Id.* at 45.
[6] *Id.* at 30, Ex. B at 5.
[7] D.I. 49, Ex. B at 14.
[8] *Id.* at 43-44.
[9] D.I. 49, Ex. A at 77, Ex. B at 63-65.
[10] D.I. 49, Ex. A at 76-77.
[11] D.I. 46 at A38-44.
[12] *Id.* at A29.
[13] D.I. 45 at A59-60.

Thereafter, Robinson provided a copy of Dr. Parker's report to Garrett.[14]  Garrett forwarded a copy of the report to her supervisor, Sandra Henry, and David Bull ("Bull") of the Human Resources Department.[15]

On January 6, 2012, Garret's performance appraisal of Robinson noted areas where improvement was needed, including job knowledge, quality of work, and communication.[16]  Because of this performance review, Robinson was put on an Performance Improvement Plan ("PIP") which provided:

> The purpose of this document is to identify performance deficiencies and to provide a clear concise mechanism for improving performance to a standard of "Meets Expectations."  Every effort will be made to provide training and support necessa[r]y for the successful completion of this Performance Improvement Plan.  The plan will be monitored as specified in the document above giving bi weekly overview until a final review is completed for determination on March 16, 2012.[17]

On January 20 2012, during an email exchange with Bull, Robinson inquired whether he was responsible to provide the necessary accommodations for her dyslexia.[18]  Bull directed Robinson to address her concerns with Garrett.  Robinson further asked if there would be any "reasonable accommodations" made for her dyslexia.[19]  Bull advised that Robinson needed to improve her job performance within the next 45 days or her employment would be at risk.[20]  In response, Robinson commented that dyslexia is considered a disability by the EEOC.  Robinson requested

---

[14] D.I. 49, Ex. B at 65.
[15] *Id.*
[16] D.I. 46 at A24.
[17] D.I. 46 at A27.
[18] D.I. 49, Ex. G at A77.
[19] *Id.* at A78.
[20] *Id.*

more hands-on training to understand the process better and improve job performance.[21]  Although Bull acknowledged receipt of Dr. Parker's report, he advised that First State did not recognize the information provided in the report as an impediment to job performance.[22]  He further stated that the instructions and expectations in the PIP had to be followed.[23]

On February 1, 2012, Robinson was instructed by Garrett to sign the Code of Ethics and Conduct which noted:

> The Code of Ethics and Conduct is an essential component of the National Industry Standard for Homeownership Education and Counseling. It is required that a signed copy be kept on file within your office for each counselor listed in your organization profile, and made available upon request.  It is important that counselors read, sign and agree to abide by the Code of Ethics and Conduct and guidelines set forth in the National Industry Standard for Homeownership Education and Counseling.[24]

Above the line for the counselor's signature, there was a box that stated:

> By checking this box or signing below, I acknowledge that I have received and read the National Industry Standards Code of Ethics and Conduct for Homeownership Professionals and agree to adopt and adhere to the guidelines as out lined.[25]

Robinson did not execute the document, but entered on the signature line:  "I will not be signing this until the recommended training is complete and strong knowledge reference in the guide is reached."[26]  Robinson testified that she refused to sign the form because "signing the form would be a misrepresentation of where I stood

---

[21] *Id.*
[22] *Id.* at A80.
[23] *Id.*
[24] D.I. 46 at A65.
[25] *Id.*
[26] *Id.*

professionally."[27]  To Robinson, signing the form meant that she was properly trained and had certification to counsel at the level of her position.[28]

On February 3, 2012, Robinson received a letter terminating her employment with First State.[29]  The letter stated that the reason for termination was due to Robinson's  ". . . refusal to cooperate in providing paramount information required . . . and unsatisfactory job performance."[30]  The termination letter referenced a specific incident during the week of January 24, 2014, noting that ". . . a housing client's case was almost irreparable resulting from your failure to perform your job responsibilities."[31]  The termination letter also claimed that Robinson ". . . openly display a disdain disgruntled behavior towards management."[32]

## III.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

A grant of summary judgment pursuant to FED. R. CIV. P. 56 is appropriate if materials on the record, such as depositions, documents, electronically stored information, admissions, interrogatory answers, affidavits and other like evidence show that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.[33]  The movant bears the burden of establishing the lack of a genuinely disputed material fact by demonstrating "that there is an absence of

---

[27] *Id.* at A6.
[28] *Id.*
[29] D.I. 46 at A66; D.I. 49, Ex. H.
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] FED. R. CIV. P. 56 (a) and (c).

evidence to support the nonmoving party's case."[34]  "Facts that could alter the outcome

are 'material,' and disputes are 'genuine' if evidence exists from which a rational person

could conclude that the position of the person with the burden of proof on the disputed

issue is correct."[35]  "Where the record taken as a whole could not lead a rational trier of

fact to find for the non-moving party, there is no genuine issue for trial."[36]

## IV.   DISCUSSION

Robinson argues that First State regarded her as disabled because of Garrett's

comment on whether she was dyslexic.[37]  She further maintains that the professional

assessment by Dr. Parker confirms her disability of dyslexia[38] which falls under

protection of the ADA.  Robinson contends she was qualified to perform the essential

functions of her job; First State was aware of its obligation to reasonably accommodate

her disability; and its failure to provide any accommodation before termination was a

violation of the ADA.[39]

First State asserts that the burden of proof rests with Robinson to demonstrate

that she is a disabled person under the ADA, a burden that she has not met.  It further

argues that the assessment by Dr. Parker fails to show that Robinson is a disabled

person within the meaning of the ADA.[40]  First State maintains that Robinson can not

---

[34] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).
[35] *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n. 1 (3d Cir.1995) (internal citations omitted).
[36] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations omitted).
[37] D.I. 48 at 8.
[38] *Id.* at 9.
[39] *Id.* at 9-12.
[40] D.I. 44 at 1.

make a prima facie case that due to any disability, an adverse employment action occurred.[41]  It contends that the reason for termination resulted from Robinson's refusal to execute the Code of Ethics and Conduct form, which is necessary for compliance with grant requirements for funding, and her poor past performance.[42]

Under the ADA, to pursue a disability discrimination claim ". . . plaintiff must be able to establish that he or she (1) has a 'disability' (2) is a 'qualified individual' and (3) has suffered an adverse employment action because of that disability."[43]  To be considered disabled under the ADA, a person must have "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ."[44]

Starting with First State's motion for summary judgment, it argues that Robinson offers no proof that she suffers from dyslexia.[45]  First State initially contends that Dr. Parker's evaluation does not support Robinson's claim of dyslexia because the report fails to state that she actually suffers from dyslexia.[46]  First State also maintains that Dr. Parker admittedly is unable to diagnose dyslexia, as evidenced by her own testimony, and could only testify that Robinson has indicators of dyslexia.[47]

Robinson points out that Dr. Parker's evaluation does provide that she suffers

---

[41] D.I. 45 at 11.
[42] *Id.* at 11-12.
[43] *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 (3d Cir. 1998).
[44] 42 USCA § 12102.
[45] D.I. 45 at 8.
[46] *Id.*
[47] *Id.*

from "[c]haracteristics of dyslexia . . . in the areas of phonological awareness, sequencing of letterss [sic] and numbers, decoding and encoding, comprehenion [sic] cenrtal [sic] auditory processing, sequencing and directionality.  These characteristics range from mild to significant,"[48] and thus, evidence dyslexia.  First State's only response to the evaluation is a mere denial.

42 U.S.C. § 12102(1)(C) also covers individuals who are ". . . regarded as having such an impairment . . . ."  To be regarded as having an impairment under 42 U.S.C. § 12102(3)(A), one must demonstrate that a prohibited action occurred because of an ". . . actual or perceived physical or mental impairment . . . ."  In the instant matter, Garrett commented to Robinson whether she had dyslexia which prompted her to seek the evaluation by Dr. Parker.[49]  Dr. Parker's report acknowledges her testing and review showed certain characteristics of dyslexia which were mild to significant.  Viewing the facts in the light most favorable to Robinson, First State's motion for summary judgment should be denied because there exists a genuine issue of a material fact on  whether Robinson is disabled or was regarded as disabled.

First State argues that Robinson has not shown any adverse action due to her disability.  This argument rests in part on whether Robinson is disabled.  Adverse action under the ADA ". . . encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities."[50]  After submitting Dr. Parker's psychological evaluation, Robinson

---

[48] D.I. 49 Ex. C at A56.
[49] D.I. 49 Ex. B at 63:line 18-22.
[50] *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d. Cir. 1999).

sought on January 20, 2012, reasonable accommodations, including hands-on organized training.[51]  In response to her request, she was only advised to follow the PIP, despite the representation in the Plan document that the training and support necessary to successfully complete the PIP would be provided.[52]  No reasonable accommodations were offered from January 20, 2012 until her termination on February 3, 2012.  Nothing in the record indicates the efforts offered by First State "to provide the training and support" needed "for successful completion of the PIP."[53]

"Once the employer knows of the disability and the employee's desire for accommodations, it makes sense to place the burden on the employer to request additional information that the employer believes it needs."[54]  Garrett testified that she never attempted to contact Dr. Parker to discuss the evaluation.[55]  Bull also testified that he did not contact Dr. Parker to discuss the evaluation.[56]  First State failed to engage in an interactive process to verify that Robinson was disabled or if she could be reasonably accommodated.  For these reasons, First State's motion for summary judgment should be denied.

Robinson also filed a motion for summary judgment claiming that she is disabled or was regarded by First State as being disabled; she satisfied all the elements for a claim under the ADA; and First State failed provide any reasonable accommodation.

Robinson contends that the comment made by Garrett inquiring whether she was

---

[51] D.I. 49 Ex. G at A79.
[52] *Id.* at A80.
[53] D.I. 46 at A27.
[54] *Taylor*, 184 F.3d at 315.
[55] D.I. 49 Ex. B at 72:line 1-5.
[56] D.I. 49 Ex. D at 35:line 18-20.

dyslexic, shows that First State considered her as dyslexic.  During her deposition,

Garrett testified that based upon her personal experience working with children in foster

care, she did not consider Robinson ". . . was anywhere near the level of deficiency" for

the children she cared for over a ten year period.[57]  Furthermore, Garrett stated that

after reviewing the psychological evaluation of Dr. Parker, she ". . . didn't think that

evaluation stated anything that she had dyslexia."[58]  Bull also testified that his

assessment of the evaluation was "that this information wasn't supporting that she had

an alleged disability."[59]  Viewing the facts in the light of the nonmoving party, Robinson

has not established that First State regarded her as having a disability.

Robinson next contends that she suffers from a disability by relying on the

evaluation by Dr. Parker.  She notes that the evaluation contains educational

recommendations.[60]  The evaluation by itself does not provide sufficient evidence that

Robinson is definitively disabled.  Although Dr. Parker is a certified psychologist, she is

not licensed to practice in any state and cannot provide a diagnosis without supervision

by a fully licensed psychologist.[61]  Dr. Parker also testified that she was only qualified to

say that Robinson showed signs of dyslexia.[62]  For a complete diagnosis of dyslexia, Dr.

Parker testified that a neurological assessment and speech and language testing are

also required.[63]  Based on the present record, a genuine issue of material fact exists

---

[57] D.I. 49 Ex. B at 69:line 20-24.
[58] *Id.*
[59] D.I. 49 Ex. D at 37:line 11-13.
[60] D.I. 46 at A32.
[61] D.I. 46 at A43-A44.
[62] D.I. 46 at A60:line 2-6.
[63] D.I. 46 at A52:line 6-A53:line 8.

10

warranting denial of Robinson's motion for summary judgment.

## V.    Order and Recommended Disposition

Consistent with the findings contained in this Report and Recommendation,

IT IS RECOMMENDED that plaintiff's motion for summary judgment (D.I. 47) be

DENIED.

IT IS RECOMMENDED that defendant's motion for summary judgment (D.I. 44)

be DENIED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B),

FED. R. CIV. P. 72(b)(1), and D. DEL. LR 72.1.  The parties may serve and file specific

written objections within ten (10) days after being served with a copy of this Report and

Recommendation.

The parties are directed to the Court's Standing Order in Non-Pro Se matters for

Objections Filed under FED. R. CIV. P. 72, dated October 9, 2013, a copy of which is

available on the Court's website, www.ded.uscourts.gov.


Dated: October 24, 2016              /s/          Mary Pat Thynge
                                     UNITED STATES MAGISTRATE JUDGE